UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Alesha Moss

          v.                         Civil No. 1:10-cv-054-JL
                                     Opinion No. 2011 DNH 064

Michael J. Astrue, Commissioner,
Social Security Administration


                          **O R D E R**

     This is an appeal from the denial of a claimant's

application for Social Security Disability Benefits.  See 42

U.S.C. § 405(g).  The claimant, Alesha Moss, contends that the

administrative law judge ("ALJ") incorrectly found that although

Moss had several severe impairments, see 20 C.F.R. §§ 404.1520

(a),(c), she was not disabled because she retained the residual

functional capacity ("RFC") to perform limited light duty work,[1]

see id. § 404.1567(b), and that despite her inability to perform

a full-range of light duty work, she was "capable of making a

successful adjustment to other work that exists in significant

_____

     [1]The ALJ concluded that Moss is limited to standing or
sitting for a maximum of four hours each in an eight hour day and
has restrictions on her ability to bend and stoop.  She also must
avoid operating machinery or driving.  Admin. R. 12.

numbers in the national economy." Admin. R. 18.[2]  Moss contends
that:

>    (1) the ALJ improperly assessed her credibility when
>    determining the limiting effects of her pain;
>
>    (2) the ALJ did not properly consider the medical
>    opinions of her treating physicians;
>
>    (3) the ALJ's decision is unsupported by substantial
>    evidence in the record because he ignored the testimony
>    of her friend and failed to consider her depression and
>    anxiety; and,
>
>    (4) the hypothetical questions posed to a vocational
>    expert were faulty and therefore the expert's testimony
>    that Moss could be gainfully employed was unsupported
>    by the evidence.

Cl.'s Br. 20.  The Commissioner asserts that the ALJ's findings
are supported by substantial evidence in the record, and moves
for an order affirming his decision.  This court has jurisdiction
under 42 U.S.C. § 405(g).  After a review of the administrative
record, the court grants Commissioner's motion and denies Moss's
motion.

---

[2]The parties filed a Joint Statement of Material Facts
(Document no. 11).  See LR 9.1(d).  The court will reference the
administrative record ("Admin. R.") to provide points of
reference or where the court directly quotes documents in the
record.  Cf. Lalime v. Astrue, No. 08-cv-196-PB, 2009 WL 995575,
at *1 (D.N.H. Apr. 14, 2009).

I.   <u>**APPLICABLE LEGAL STANDARD**</u>

The court's review under Section 405(g) is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).  If the ALJ's factual findings are supported by substantial evidence in the record, they are conclusive, even if the Court does not agree with the ALJ's decision and other evidence supports a contrary conclusion. <u>See</u> <u>Tsarelka v. Sec'y of Health & Human Servs.</u>, 842 F.2d 529, 535 (1st Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quotations omitted); <u>Currier v. Sec'y of Health, Ed. & welfare</u>, 612 F.2d 594, 597 (1st Cir. 1980).  The ALJ is responsible for determining issues of credibility, resolving conflicting evidence, and drawing inferences from the evidence in the record. <u>See</u> <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981).  "Resolution of conflicts in the evidence or questions of credibility is outside the court's purview, and thus where the record supports more than one outcome, the ALJ's view prevails." <u>Pires v. Astrue</u>, 553 F. Supp. 2d 15, 21 (D. Mass. 2008).  The ALJ's findings are not conclusive, however, if, after review of the entire record, they were "derived by ignoring

evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35.

## II.  BACKGROUND

Moss primarily claims disability due to chronic pain in her back, pain and numbness in her leg, depression/anxiety, and right shoulder pain.  The medical records pertaining to the relatively short period between the claimed onset date of April 4, 2006 and the hearing before the ALJ in August 2009 are lengthy.  They reveal a rather chaotic history marked by multiple trips to different hospital emergency rooms, (sometimes within days or hours of each other), use of multiple pain therapy and primary care providers, and serial accidents (some of unclear detail) resulting in various injuries to and complaints of:  numbness in her leg, and pain emanating from, inter alia, Moss's back, chest, knees, ankles, toes, shoulders, and her clavicle.  See generally, Admin. R. 202-03, 209, 212, 311, 337-43, 392-394, 408, 437, 448, 455, 468, 521, 532,548, 557, 618, 623-626, 628-630, 634-35, 694-95.

The parties submitted a Joint Statement of Material Facts (document no. 11) which is part of the court's record.  See LR 9.1(d).  The facts included in that statement are recited here in

summary fashion[3] to the extent necessary to provide adequate
background for the analysis that follows.


## A.   Procedural history

In February, 2008, Moss, then 29 years old, applied for
disability benefits and supplemental security income benefits
claiming she was disabled since April 4, 2006 due to nerve damage
in her back and legs, anxiety, depression, arthritis in her right
knee and "shoulder problems."  Admin. R. 149, 153.  She claimed
that she was in constant pain, couldn't stand or sit for "any
length of time," and had leg swelling.  She stated that her
"[l]eg goes numb so at times I will fall," and that she was
"tired all the time because of depression."  Id. at 153.  The
Social Security Administration denied Moss's claims in May 2008,
determining that despite her impairments, she was capable of
performing "sedentary work."  Id. at 72-73.  Moss appealed that
decision to the ALJ, see 20 C.F.R. § 405.1(b)(3), who, after a

---

[3]The following recitation is lengthy, but remarkably
includes only a fraction of the evidence in the record and
discussed in the Joint Statement of Material Facts.

Moss's challenge regarding the ALJ's findings with respect
to the claimed limiting effects of depression and anxiety is
brief, see Cl. Br. 19, and although addressed by the court, is
not well developed.  Cf. Wall v. Astrue, 561 F.3d 1048, 1065
(10th Cir. 2009)(district courts need address only issues raised
and properly briefed by a claimant).  Evidence regarding
depression and anxiety will be noted only to the extent they are
relevant to the court's analysis, as such record evidence is
amply set forth in the Joint Statement of Material Facts.

hearing, affirmed the denial of her claim.  Admin. R. 7-19.  The
Decision Review Board, <u>see</u> <u>generally</u> 20 C.F.R. §405.401, did not
complete its review of the ALJ's denial in a timely fashion,
Admin. R. 1-3, rendering the ALJ's decision the final decision of
the Commissioner.  <u>See</u> 20 C.F.R. § 405.415.  This appeal
followed.

## B.    Medical evidence before the ALJ

On April 4, 2006 Moss arrived at the emergency room of
Catholic Medical Center complaining of dizziness, headache, and
nausea.[4]  Extensive testing, including a lumbar puncture[5] was
performed, but did not reveal any remarkable issues.  Admin. R.
at 540-46.  Two days later, Moss arrived at the emergency room at
the Elliot Hospital, complaining of back pain arising since the
spinal tap.  <u>Id.</u> at 348.  Four days later, on April 10th, a
lumbar spine x-ray showed a "transitional lower lumbar vertebral
body," but was otherwise unremarkable.  <u>Id.</u> at 347.  Moss then
returned to Catholic Medical Center's emergency room on April

[4]The court notes that Moss has a history of pain complaints
and emergency room visits that pre-date April 2006.  <u>See</u>, <u>e.g.</u>,
Admin. R. 364, 529-32.  However, the origin of her primary
impairments, back and leg pain, appears to emanate primarily from
a series of events beginning in April 2006.

[5]A lumbar puncture test is "the withdrawal of fluid from the
subarachnoid space in the lumbar region . . . for diagnostic or
therapeutic purposes."  <u>Dorland's Illustrated Medical Dictionary</u>,
1579 (31st ed. 2007).  It is more commonly referred to as a
"spinal tap", <u>id.</u>, and will be referred to as such.

12th and again on April 13th, complaining of intense pain and numbness down her right leg.  Id. at 567.  She was diagnosed with "[l]ow back pain with radicular pain down the right buttock and leg – etiology of this is unclear."  Id. at 568.  A lumbar MRI taken while Moss was at Catholic Medical Center was determined to be normal.  Id. at 570.  Moss had a neurological consultation at Catholic Medical Center on April 13th.  The examining physician opined that "[t]he cause of these symptoms is not clear as it does not clearly conform to any recognizable pattern of neurologic dysfunction."  Moss declined further testing.  Id. at 572.

    Moss was admitted to the Elliot Hospital later that day complaining of back pain and headache.  Id. at 337-39.  Hospital staff consulted with physicians at Catholic Medical Center and diagnosed Moss with "[l]ow back pain and headache, both of unclear etiology."  Id. at 337.  The emergency room physician observed that he had "no anatomic explanation for her complaints of pain at this time," prescribed Percocet[6] for pain, and recommended that Moss follow-up with her primary care physician. Admin. R. 339.  It is of note that while at the Elliot Hospital,

---

    [6]Percocet is a "combination preparation of oxycodone hydrochloride and acetaminophen."  Dorland's Illustrated Medical Dictionary, 1429.  Oxycodone hydrochloride is more commonly known as the narcotic "Oxycontin," id. at 1377, and is derived from morphine.  Id.

multiple staff members observed that Moss engaged in various behaviors inconsistent with her complaints of pain.  Id. at 338.

Following her discharge from the Elliot Hospital on April 15, 2006, Moss visited Willowbend Family Practice, Lewis Physical Medicine Associates and the Elliot Hospital emergency room on multiple occasions in April through August, complaining mostly of significant low back pain since her spinal tap in April.  Various providers noted conflicting findings.  For example, Moss could ambulate and/or climb up or hop off a treating table without difficulty, and at times denied, but at other times complained about, pain radiating down her legs.  She also exhibited normal strength in her lower extremities, but had limited ranges of motion and tenderness due to pain.  Id. at 328, 357, 361-62, 756-63.  An MRI taken of Moss's lumbar spine on August 23, 2006 was reported as "[n]ormal MR evaluation of the LS-spine except for a small . . . defect involving the superior endplate of L2."  Id. at 331.

In September 2006, Moss began treatments at the Elliot Hospital Pain Management Center complaining that she had lower back and leg pain since her spinal tap in April.  Id. at 323. She continued to see various providers there and receive various injections and pain medications (including narcotics) through March 2007.  Id. at 297-324.  Her providers noted that Moss's right side back pain appeared to be "mechanical in nature," id.

8

at 318, 323, with "some right leg radicular pain."  Id. at 318.
On another occasion, Nurse Practitioner Bridget Alcorn noted that
although Moss complained of both left and right back pain, an
exam revealed that Moss had some back tenderness on her right
side, she had significantly less pain on the left side, and that
she was "unable to produce any radiating or radicular pain."  Id.
at 312.  She also observed that Moss "ambulates with a steady
gait."  Id.

On March 5, 2007, a nerve conduction test suggested a "low
level S1 dysfunction," but it was otherwise normal.  Id. at 484-
85.  In a note to Nurse Alcorn, neurologist Dr. Mark Biletch
opined that "[t]oday's study was without definite abnormality on
needle exam, though [Moss] had a mildly prolonged right H-reflex
that goes along with [a] slight right S1 root dysfunction.  I
think her situation has a positive outlook."  Id. at 488.

Moss began treatment with a pain specialist, Dr. Powen Hsu
of New Era Medicine, in April 2007.  During his initial
examination, Dr. Hsu noted that Moss had a full range of motion
and no lower extremity weakness.  Dr. Hsu noted that based on the
EMG in March, she likely had radiculitis.  Id. at 506-507.  Moss
treated with Dr. Hsu until November 2008 for not only back and
leg pain, but shoulder pain as well.  During that time, she met
with Dr. Hsu on multiple occasions and received a number of
different treatments including prescriptions for multiple pain

medications.[7]  During this time, Moss sought pain relief not only from Dr. Hsu, but often would present herself at emergency rooms at the Elliot Hospital (on April 29, 2007, May 27, 2007, June 16, 2007, August 19, 2007), id. at 189-90, 191, 195, 446, Catholic Medical Center (on April 30, 2007, June 16, 2007, June 24, 2007), id. at 442, 450, 516, and at Concord Hospital (on August 2, 2007, May 4, 2008, October 27, 2008, November 20, 2008) id. at 222, 610, 613, 624, often within days of treating with Dr. Hsu.

Objective medical testing continued to yield relatively ambiguous results. In June 2007, a lumbar spine MRI appeared normal.  Id. at 199.  Shoulder x-rays following an August 2007 fall were "unremarkable."  Id. at 246.  On February 21, 2008, an EMG study reported "electrophysiologic evidence of a possible right L5-S1 radiculopathy."[8]  Admin. R. 243-45.  At one visit on October 5, 2007, Dr. Hsu diagnosed Moss with osteoarthritis in the knees and lower leg, lumbosacral spine pain, and radiculitis in the "thoracic/lumbar spine."  He noted that she was unable to work because of radiculopathy and osteoarthritis.  Id. at 236

---

[7]It appears from the record that Moss often took multiple prescription pain medications prescribed by Dr. Hsu in addition to medications received from her various trips to local emergency rooms.

[8]Radiculopathy is defined as a "disease of the nerve roots." Dorland's Illustrated Medical Dictionary, 1595.  Radiculitis is an "inflammation of the root of a spinal nerve."  Id.

Dr. Hsu completed a Medical Source statement for Moss in February 2008.  Id. at 226-229.  Dr. Hsu opined, inter alia, that although Moss could lift a maximum of 20 pounds occasionally and frequently, she could only sit or walk for 15 minutes at a time, stand for 10 minutes, she needed frequent unscheduled breaks and could only sit/stand/walk for a total of 4 hours per day.  He assessed significant hand and foot restrictions as well as postural restrictions.  He did not feel that she required use of a cane, but opined that she would be absent from work three times per month.  Dr. Hsu stated that these limitations had been present since April 4, 2006 and based this assessment on "S1 joint dysfunction, shoulder strain, and S1 radiculopathy on EMG." Id. at 229.

In addition to treating with Dr. Hsu, Moss was seen on multiple occasions for various issues (sore throat, right leg pain, ankle pain, hip pain, knee pain) by Dr. Michael Mattin and Nurse Practitioner Michelle Driscoll at Willowbend Family Practice.  Id. at 362, 387, 396.  In August 7, 2007, Moss went to Dr. Mattin at Willowbend to follow up on a visit to the Concord Hospital Emergency room five days earlier complaining that she had chronic nerve damage in her right leg and had fallen down two stairs injuring her right shoulder.  Id. at 395, 222-223.  An x-ray of her shoulder was normal.  Id. at 246.  Dr. Mattin observed that Moss walked with a limp and had underlying right leg

radiculopathy.  He diagnosed her shoulder injury as an "AC
separation."  Id. at 395.  Ten days later, Moss reported, in a
telephone call to Willowbend, that she was "fed up" with pain,
and needed to obtain more pain medications.  When she was
informed that such an act would be in violation of a pain
contract, she stated, "I don't care, I'll be switching pain
centers anyway."  Id. at 393.

Moss saw Dr. Mattin again on September 28, 2007 complaining
of increased right leg, ankle pain, hip pain, and "grinding of
her kneecap."  She also complained that her children had broken
her cane and that she needed more Dilaudid,[9] although she
recognized that she needed to obtain that medication from Dr.
Hsu.  Dr. Mattin assessed her with bursitis and tendonitis due to
overuse from limping without a cane.  He gave her a new
prescription for a cane.  Admin. R. at 387.

Moss returned to Dr. Mattin on December 17, 2007,
complaining that she had injured her shoulder after doing some
overhead lifting during a work capacity evaluation.  He diagnosed
her with an unstable shoulder and recommended physical therapy.
She returned again on December 31, 2007 complaining of shoulder
pain, Dr. Mattin reported that Moss had been shoveling snow and

---

[9]Dilaudid is a "preparation of hydromorphone hydrochloride."
Dorland's Illustrated Medical Dictionary, 527.  Hydromorphone is
"a morphine alkaloid, having opioid analgesic effects similar to
but greater and shorter duration than those of morphine."  Id. at
891.

fell.  He diagnosed her with a rotator cuff injury.  Id. at 701-
702.

Moss next saw Dr. Douglas Moran at Concord Orthopaedics for
right shoulder pain in January 2008.  She reported to Dr. Moran
that she had a four month history of pain after hitting her
shoulder during a fall.  She claimed that the pain increased when
she raised a weight over her head during a functional evaluation.
She then claimed that a few weeks later she slipped on ice and
landed on her shoulder again.  Dr. Moran noted that physical
therapy did not give her much improvement, and she had "quite a
bit of disability with everyday activities."  He concluded that
she had right shoulder impingement syndrome and rotator cuff
weakness.  Id. at 250-51.  A month later, Dr. Moran noted that
despite Moss's claim that she had a setback in physical therapy,
Moss made significant progress in her range of motion and could
use the arm more freely.  Id. at 249.  After Moss returned to Dr.
Moran on March 24, 2008 complaining of continued shoulder pain,
Dr. Moran recommended arthroscopic surgery.  Id. at 641-42. At
the time, Dr. Moran noted Moss's "complex pain medicine history,"
and stated that although he would need to prescribe pain
medication immediately after surgery, "I do not want to mess with
that for more than a couple or three days."  Id. at 642.

A few weeks later, Nurse Driscoll completed a Medical Source
Statement for Moss on April 7th.  Nurse Driscoll's assessment

13

roughly mirrored that of Dr. Hsu, except that she opined that Moss could lift less than 10 pounds occasionally or frequently, required use of a cane, and she needed to elevate her feet or legs during the workday.  Nurse Driscoll wrote that these limitations had been present since April 2006, and her opinion was based on a right shoulder "rotator cuff tear, S1 joint dysfunction, [and] S1 radiculopathy on EMG."  Id. at 263-66.

Moss had arthroscopic surgery on April 29th.[10]  At a follow up visit on May 6, 2008, Dr. Moran opined that Moss was healing well and that he "had the highest expectations" for long-term recovery of the shoulder.  Id. at 643.  Later that month on May 28th,[11] she complained to Dr. Moran that she had fallen again, and was experiencing increased shoulder pain.  X-rays showed no acute abnormalities, although Moss demonstrated decreased strength and a limited range of motion.  Id. at 644.  Dr. Moran subsequently ordered an MRI after Moss continued to complain of shoulder pain and limited shoulder function in June.  Dr. Moran reviewed the MRI on July 8th and stated that it showed a "tiny

[10]It should be noted that five days after surgery, Moss went to the Concord Hospital emergency room complaining of post operative shoulder pain.  She was prescribed Vicoprofen, a medication combining hydrocodone (an opioid derived from codeine) and ibuprofen.  Id. at 624-26; see Dorland's Illustrated Medical Dictionary, 891, 2084.

[11]In between these visits, Moss complained to Dr. Hsu that she had tripped and fallen down resulting in increased back and shoulder pain.  Dr. Hsu gave Moss additional prescriptions for pain control.  Id. at 684-85.

pin hole tear of the supraspinatus" which did not require further
surgery.  Id. at 646.  By September 2008, Moss reported to Dr.
Moran that she was doing better and had only occasional pain.  He
stated that Moss was "back to feeling as well as she was before
her fall."[12]  Id. at 647.

On October 27, 2008 Moss presented at the emergency room at
Concord Hospital.  She stated that she injured her shoulder and
head after she fell down five stairs.  She reported that her
boyfriend had thrown her purse (containing all her medications)
into the river and that she had been chasing him.[13]  Moss was
diagnosed with a right clavicle fracture and given a prescription
for Dilaudid.  Id. at 614-621.

Dr. Hsu refilled her outstanding prescriptions on October
29th to replace those Moss reported being thrown into the river.
Id. at 695.  On November 20, 2008 at 12:06 AM, Dr. Hsu noted that
Moss called him requesting hospital admission due to severe pain.
He refused to admit her without seeing her (noting that she had
missed a November 13th appointment).  Id. at 696.  Two hours

---

[12]It should be noted however, that during this period, Moss
had complained to Dr. Hsu that she had significant increase in
leg pain and that she had major issues with her shoulder.  Id. at
689-91.

[13]Records indicate that she told a social worker at the
hospital that she had three children, one of whom was home
schooled.  Id. at 614.  She did not indicate that her children
were living with her ex-husband or that he home schooled them.
See Part III-A infra.

later, Moss went to Concord Hospital Emergency room complaining of increased right arm pain.  She reported that her prescriptions for Dilaudid, Lyrica, Ativan, and Soma were ineffective.  She was given Valium[14] and Dilauded, and a prescription for Valium.  Id. at 609-11.  Later that day, Dr. Hsu discharged her from his practice for "missed appointments."  Id. at 780.

The next day, Dr. Moran reviewed x-rays of Moss's clavicle and noted that her fracture was trying to heal.  He gave her a regular sling.  Id. at 649.  On December 9th, Dr. Moran noted that Moss's clavicle was slow to heal and that she may need to be evaluated for surgery.  During a follow-up appointment on January 8, 2009, Dr. Moran again noted that the clavicle was slow to heal.[15]  Id. at 651-53.  In February, Dr. Patrick Casey of Concord Orthopaedics reviewed Moss's clavicle x-rays and noted that it appeared to be healing.  He stated that it was taking longer to heal, but that he expected it would improve.  Id. at 654.  In May 2009, Dr. Moran reviewed new x-rays and opined that Moss's clavicle had "clearly healed."  Id. at 776.

In July 2009, Dr. Moran completed a medical source statement.  He limited his observations to limitations "imposed

---

[14]Valium is a form of diazepam, which is used as a muscle relaxant, anti-anxiety and anti-panic medicine, and anti-tremor medicine.  Dorland's Illustrated Medical Dictionary, 519, 2049.

[15]Dr. Moran also noted in January 2009 that Moss was home with her three children.  Id. at 653.

by injury to right arm only." Id. at 764.  He opined that Moss
could lift/carry less than 10 pounds, did not require a sit/stand
option, unscheduled breaks, use of a cane, or take breaks to
alleviate pain, and did not need to elevate her feet/legs during
the workday.  He noted significant right hand limitations, but
none for her left hand.  He based his limitations on "Rt shoulder
pain," but stated that these limitations had been present only
since "2008."  Id. at 764-68.

     After Dr. Hsu released Moss from his practice, pain
management fell mostly to Dr. Mattin at Willowbend.[16]  He
initially prescribed Lyrica, id. at 712, and later added
Methadone[17] and Dilaudid.  Id. at 713.  On February 2, 2009, Moss
complained that Methadone gave her headaches, so Dr. Mattin
prescribed OxyCotin.  Id. at 714.  A few weeks later, Moss
continued to limp and complained that her left leg was now
painful.  Dr. Mattin then increased her dose of OxyCotin.  Id. at
715.  When Moss returned in March 2009 to Dr. Mattin she reported
that she had run out of Lyrica and that Oxycotin wore off after

---

     [16]Although Moss initially intended to see Dr. O'Connell for
pain management, id. at 710, 712, she was turned down by Dr.
O'Connell as a patient.  Id. at 713.

     [17]Methadone is a "synthetic opioid analgesic, possessing
pharmacologic actions similar to those of morphine and heroin."
Dorland's Illustrated Medical Dictionary, 1163.

five to seven hours.  Dr Mattin refilled her Lyrica prescription and increased her OxyCotin dose.  Id. at 716.[18]

On July 14, 2009, Dr. Mattin completed a medical source statement for Moss.  Id. at 769-72.  Dr. Mattin opined that Moss could lift/carry 20 pounds occasionally or frequently, needed a sit/stand option, unscheduled breaks during the work day, could sit or walk 15 minutes and stand for 10 minutes at a time, and could sit/stand/walk for a combined total of 4 hours out of an eight hour day.  He also opined that she would need to rest for pain relief for five minutes of every 30 minutes of activity and would need a one hour rest break.  Dr. Mattin concluded that Moss had significant hand and foot restrictions as well as postural restrictions and environmental restrictions.  He opined that she was limited in operating a motor vehicle.  He predicted that she would be absent three times per month due to her impairments.  He based this assessment on a finding of "radiculopathy by EMG . . . S1 abnormality."  He stated that Moss's impairments had been present since April 4, 2006.  Id. at 769-72.

In addition to Moss's treating physicians, Dr. Charles Meader, a consulting physician for the Commissioner, completed a

---

[18]From February 2009 through June 2009, Moss was also receiving various injections for pain from Dr. David Nagel at Concord Hospital.  Id. at 655, 657, 773, 777.  In February 2009, Dr. Nagel noted that Moss had been referred to him by Dr. Mattin for "[q]uestion right sacroiliac joint pain" and that "[a]n MRI of her back was done, and the results are pretty unremarkable." Id. at 655.

residual functional capacity assessment in April 2008 based on
Moss's medical records to date.  Id. at 254-61.  Meader opined
that Moss could lift up to 20 pounds occasionally and 10 pounds
frequently.  He opined that she could stand and/or walk each for
four hours during a workday and could sit for a total of six
hours.  He opined that she could occasionally complete all
postural activities, and could only have limited exposure to
machinery and heights due to medication induced drowsiness.  In
formulating his conclusions, Dr. Meader supported his assessments
with detailed references to Moss's medical records, the results
of objective testing, and Moss's own function report.  Id. at
261.

The ALJ also heard testimony from a vocational expert,
Christine Spaulding.  Admin. R. 44-53, 102.  The ALJ posed three
hypothetical residual functional capacities.  Id. at 45.  In
response to two hypotheticals, including one with a hypothetical
RFC equivalent to the one eventually drafted by the ALJ, the
vocational expert concluded that there would be work available to
her.  Id. at 45-48.  In the final hypothetical, the ALJ asked the
expert to assume, inter alia, that Moss could only lift less than
10 pounds occasionally, could not reach overhead, would be able
to sit, stand, and lay down at her discretion with frequent
breaks, and would experience difficulty with her concentration
and completing tasks.  In that instance, the expert opined that

there are no jobs that could accommodate these restrictions.  Id.
at 48.


**C.   Moss's written statements and testimony**

In March 2008, Moss filed a "Function Report" with the
Social Security Administration detailing the limitations arising
from her impairments.  On a daily basis she described caring for
her children, shopping, cooking, and attending physical therapy,
although she alleged that each task is followed by significant
rest, and that "there are days I can't get out of bed except to
go to the bathroom and get something to eat and drink."  Id. at
162.  She claimed that her boyfriend helped her care for the
children and her, and that her children, then ages 11, 9, and 7,
"help me cook and clean as I supervise them."  Id. at 163.  She
also described a profound inability to care for herself.  Id.
Although Moss stated that she prepares meals, she claims they are
"mostly fast meals like frozen foods, sandwiches and all ready
prepared meals."  Id. at 164.  She claimed that she only complete
light housework "for 10-15 [minutes] at the most" and that
"[u]sually my kids and my boyfriend do the chores."  Id.  She
claims that although she can drive, she only leaves her home to
go to doctor's appointments, physical therapy, and to do basic

20

food shopping at a "corner store."[19]  She does state that she can manage her personal finances, but that she only has social contact when friends visit her or via telephone while she is "laying on the couch."  Id. at 165-66.

When asked to describe her functional abilities, Moss claimed that pain renders her unable to lift, squat, bend, stand, reach, walk (for more than 10-15 minutes at a time), sit, kneel, talk, climb stairs, remember, and complete tasks, and when asked to explain, she noted "see Dr. Hsu's Medical Assessment dated 2/20/08."  Id. at 167.  She claims that she does not follow instructions well, and can only pay attention for "10-15 [minutes]" because "of pain and side effect of new meds."  Id. Finally, she claims to require use of a cane "when [the] pain is really bad in [my] leg."  Id. at 168.

Moss's testimony before the ALJ mirrors her statements in the Function Report.  Id. at 22-39.  Essentially, she claims that primarily back, leg, and arm pain has left her unable to sleep, unstable on her legs, and unable to sit, stand or lay down for any extended period of time.[20]  Id. at 25-26.  She did state that as of the date of the hearing, August 14, 2009, her children had been attending school in their father's (her ex-husband's) town

_____

[19]She claims that if she goes to a larger store, she needs to use a "motorized cart."

[20]She also testified that she was severely depressed and had anxiety.  Id.

for a year, and had been "spending more time with [their father] than with me" for approximately two years.  Id. at 27-28.[21] Additionally, she described difficulty driving because she was "afraid to drive if my leg goes numb because I don't want to put my life or somebody else's life at risk," and because her pain medications make her head "foggy."  Id. at 29.

## D.   The ALJ's decision

The ALJ conducted a hearing in August 2009, at which Moss, her friend Dean Romilard, and vocational expert Christine Spaulding testified.  Id. at 20.  A month later, the ALJ issued an order denying Moss's request for benefits.  Id.  The ALJ concluded that although Moss was severely impaired by a "slight right S1 root dysfunction and right shoulder impairment," id. at 10; see 20 C.F.R. § 404.1520(a)(4)(ii), she retained the residual functional capacity to perform light work[22] "except [that] she is

---

[21]Thus, according to her hearing testimony, Moss did not actively care for her children on a daily basis beginning around August 2007.  As discussed in more detail infra Part III-A, this testimony is inconsistent with the Function Report she filed in March 2008, indicating daily activities with her children, and reports made to various medical providers after August 2007. See, e.g., Admin. R. 269, 653.

[22]Light work is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

able to sit or stand for a maximum of up to 4 hours each in an 8 hour workday."[23]  Id.

The ALJ made certain key rulings regarding Moss's credibility when he determined that Moss possessed the RFC to perform slightly less than light exertional work.  The ALJ concluded that Moss's statements about the extremely limiting nature of her impairments were not credible based on:  (1) the absence of "medically documented objective findings and test results" supporting a severe disability, (2) multiple inconsistent statements by Moss, (3) evidence that Moss engaged in "medication seeking behavior," and (4) Moss's own function report which the ALJ found supported his RFC determination. Admin. R. 13-16.

The ALJ concluded that full disability was not supported by the abundant, but sometimes ambiguous, medical evidence concerning Moss's lower back pain and accompanying numbness/weakness in her leg.  He referenced multiple magnetic resonance imaging ("MRI") scans and x-rays in 2006, 2007, and 2008 revealing normal anatomy.  Id. at 13.  He noted that EMG studies conducted in 2007 and 2008 do not support severe impairment, but rather that the 2007 EMG study "is noted to be

---

[23]The ALJ also concluded that Moss was able to perform an "occasional postural activity with restrictions on bending and stooping and she must avoid operating machinery and/or driving due to medication use which results in drowsiness."  Admin. R. 12.

23

unremarkable except for evidence of a mildly delayed right H-reflex suggestive of <u>low</u> <u>level</u> S1 root dysfunction with a subsequently completed EMG (February 2008) revealing evidence of a <u>possible</u> right L5-S1 radiculopathy." <u>Id.</u> (citations omitted and emphasis added). He noted that several of Moss's medical records "reveal evidence of varying reports of symptoms with regard to her right versus left leg . . . .," <u>id.</u> at 13 (record citations omitted), and multiple observations by medical providers that Moss "ambulates without assistance," was able to climb and hop off an examining table, sit for a prolonged period of time, and exhibited "a full range of motion of her lumbar spine and no weakness of the lower extremities."[24]  <u>Id.</u> at 14 (record citations omitted).

With respect to Moss's shoulder limitations, the ALJ, citing the post surgical notes of Dr. Moran, concluded that the objective medical evidence did not support continued functional limitation. The ALJ cited tests demonstrating that Moss's shoulder and clavicle injuries were healing. <u>Id.</u>  He noted that although the "records do reveal evidence of temporary periods

---

[24]On appeal to this court, Moss disputes the finding by the ALJ regarding office notes indicating a greater ability to ambulate than claimed by Moss. She is correct that some notes support a more limited ability to move. But others do not, and it is for the ALJ to resolve conflicts in the evidence based on the record as a whole. In this case, given the existence of ample evidence supporting the ALJ's view of the record, <u>see</u>, <u>e.g.</u>, Admin. R. 232-42, 443, 450, 518, 610, the court cannot find error. <u>See</u> <u>Rodriguez</u>, 647 F.2d at 222.

(less than 12 months duration) during which she experienced additional limitation of function . . . I find no evidence of any objective findings which would warrant further reduction of her [RFC]." Id.

In addition to concerns arising from the objective medical evidence, the ALJ also found Moss less than credible "based upon inconsistencies noted throughout the record." Id. In a rather lengthy discussion, the ALJ noted inconsistent behavior by Moss that was observed by hospital staff, reports to providers about her role in raising her three children that varied from her testimony before the ALJ, confusing reports regarding the events leading up to an October 2008 fall, and finally, that Moss's use of a cane was sporadic and often inconsistent with her ability to ambulate as observed by medical providers. Id. at 14-15. The ALJ also noted, in great detail, that Moss's "records also reveal evidence of some medication seeking behavior." Id. at 15.

The ALJ also concluded that the record and the claimant's self-reported function report were "indicative of an ability to perform a significant range of work activity." Admin. R. 16. He noted that she reported caring for her children, preparing family meals, completing household chores, driving, shopping, and managing her personal finances. He also noted that in a medical report, she stated that she had been shoveling snow. Id.

25

The ALJ gave limited weight to the opinions of Drs. Hsu, Mattin, and Moran and Nurse Practitioner Driscoll "to the extent that their assessments of the claimant's physical residual functional capacity are inconsistent with my above noted finding of a less than full light residual functional capacity."  Admin R. 17.  He concluded that additional limitations assessed by these treating physicians were not supported by the record, and improperly based on Moss's subjective allegations of pain.  Id.

The ALJ nonetheless held that Moss's impairments precluded her from returning to her former work as a retail assistant manager.  Id.; see 20 C.F.R. § 404.1520(a)(4)(iv).  He concluded, however, based on the testimony of a vocational expert at the administrative hearing about the availability of jobs given Moss's age, education, work experience, and RFC, Moss was capable of working at a significant number of jobs in the national economy and was not disabled.  Admin. R. 17-18; see generally 20 C.F.R. § 404.1566(e).

## III. ANALYSIS

A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a)(4).  The applicant bears the burden through the first four steps to show

that she is disabled.[25]  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner bears the burden of showing that a claimant has the residual functional capacity to perform other work that may exist in the national economy.  Id.; see also 20 C.F.R. § 404.1520(a)(4)(v); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's conclusions at steps four and five are informed by his assessment of a claimant's residual functional capacity ("RFC"), which is a description of the kind of work that the claimant is able to perform despite her impairments.  20 C.F.R. §§ 404.1520, 404.1545.

Here, the ALJ denied Moss's application because he concluded, at the fifth step of the evaluation, that although Moss was impaired, she possessed the RFC to enable her to perform work available in significant numbers in the national economy.

---

[25]Specifically, the claimant must show that:  (1) she is not engaged in substantial gainful activity; (2) she has a severe impairment; (3) the impairment meets or equals a specific impairment listed in the Social Security regulations; or (4) the impairment prevents or prevented her from performing past relevant work.  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

**A.    Credibility determination**

Moss asserts that the ALJ erred when he found "the
claimant's allegations to be less than credible based upon
inconsistences noted throughout the record."  Admin. R. 14.
Specifically, Moss states that "[a]ll the alleged inconsistencies
found by the ALJ are either based on a misunderstanding of the
facts or are irrelevant to the issue of [Moss's] disability."
Cl. Br. 10.  The Commissioner responds that Moss's "entire
credibility argument does no more than charge that the ALJ should
have interpreted the evidence in her favor rather than against
it" and the record contains many facts supporting the ALJ's
negative credibility determination.  D's Br. 20.

As demonstrated <u>supra</u> Part II, a review of the record
reveals a chaotic medical history replete with uncertain,
inconsistent, or ambiguous reports.  Against this backdrop, the
court is particularly mindful that "resolution of conflicts in
the evidence or questions of credibility is outside the court's
purview, and thus where the record supports more than one
outcome, the ALJ's view prevails as long as it is supported by
substantial evidence."  <u>Pires</u>, 553 F. Supp. 2d at 21; <u>see</u>
<u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195
(1st Cir. 1987)("The credibility determination by the ALJ, who
observed the claimant, evaluated [her] demeanor, and considered
how that testimony fit in with the rest of the evidence, is

entitled to deference, especially when supported by specific
findings.").  Although Moss may be correct that certain record
evidence supports a more generous disability conclusion, because
there is substantial record support for the ALJ's conclusions,
the court finds no error.[26]

"[T]he extent to which an individual's statements about
symptoms can be relied upon as probative evidence in determining
whether the individual is disabled depends on the credibility of
the statements."  SSR No. 96-7p, 1996 WL 374186, at *4 (July 2,
1996).  Assessment of a claimant's credibility is the exclusive
province of the ALJ, who observes the claimant, evaluates her
demeanor, and considers how her testimony "fit[s] in with the
rest of the evidence."  Frustaglia, 829 F.2d at 195 .

The ALJ's decision "must contain specific reasons for the
finding on credibility, supported by the evidence in the case
record, and must be sufficiently specific to make clear to the
individual and to any subsequent reviewers the weight the
adjudicator gave to the individual's statements and the reasons

---

[26]The claimant's argument refers to instances where the ALJ
arguably misread the record, and the Commissioner concedes that
fact in at least one instance.  Cl's Br. 19.  However, as will be
discussed infra, there was ample other record evidence adequately
supporting the ALJ's credibility conclusions.  See Bartley v.
Astrue, No. 07-89-B-W, 2008 WL 2704827, at *6-*7 (D. Me. June 30,
2008).  Indeed, ALJ is not required to read the evidence in a
light most favorable to the claimant, and on review, this court
need only ask if the ALJ's decision is supported by substantial
evidence.  Pires, 553 F. Supp. 2d at 21.

for that weight."  SSR No. 96-7p, 1996 WL 374186, at *4; see Da
Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir.
1986); Pires, 553 F. Supp. 2d at 22.

    In determining the credibility of a claimant's subjective
testimony, the ALJ must consider the entire record, including
objective medical evidence, the claimant's statements,
information provided by physicians and other witnesses, and any
other relevant evidence.  SSR No. 96-7p, 1996 WL 374186, at *2.
A claimant's subjective complaints of pain will be deemed
credible only if they are consistent with objective medical
evidence and other evidence in the record.  20 C.F.R. §
404.1529(a)

    First, there is objective medical evidence supporting the
ALJ's conclusion that although the evidence contains medically
determinable reasons for Moss's subjective complaints of pain, it
does not support the severity, intensity, and persistence of her
complaints.  Admin. R. at 13.  See generally SSR 96-7p, 1996 WL
374186, at *2.  Numerous test results demonstrated either normal
findings or ambiguous etiology.  In addition, the ALJ properly
pointed out that while at times Moss demonstrated some weakness
and reduced range of motion, there were many other instances
where Moss demonstrated a full range of motion and normal leg
strength.  EMG tests completed in March 2007 and 2008 showed some
objective signs of dysfunction, but did not support Moss's report

of severe disability.  The March 2007 EMG was "unremarkable"
except for a "mildly delayed right H-refelx [suggesting] low
level S1 dysfunction."  Admin. R. at 485.  A neurologist's note
accompanying that study stated that "[t]oday's study was without
definite abnormality . . . though she had a mildly prolonged
right H reflex that goes along with slight S1 root dysfunction.
I think her situation has a positive outlook."  Id. at 488.  The
EMG study completed in 2008 produced normal results except for
"evidence of a *possible* right L5-S1 radiculopathy."[27]  Id. at 245.
February 2009 records further support the ALJ's conclusion,
noting that "[a]n MRI of her back was done, and the results are
pretty much unremarkable."  Id. at 655.  Moreover, objective
medical evidence regarding her right shoulder and clavicle
demonstrates that although at the time of her injuries Moss
suffered limiting impairments, by the date of the ALJ hearing,
those injuries had healed to the point that it was reasonable for
the ALJ to conclude that severe restrictions were not warranted.
Id. at 643, 644, 647 (noting Moss's shoulder "is back to feeling

---

[27]Dr. Hsu's notes from a follow up exam in February 2008
after the EMG indicate only "mild tender trigger points that is
defused from C6 level down to S1 worse at the L4-S1" and "no
weakness in both lower extremities."  Id. at 242.  Indeed, Dr,
Hsu notes for the period from August 2007 through February 2008
reveal that with one exception, Dr. Hsu consistently found no
lower extremity weakness.  Id. at 232-242.  In September 2007,
Dr. Hsu noted that "[t]here is perceived weakness of right as
compared to left, however, there is no gait deviations with
ambulation.  Balance standing and during her gait is good."  Id.
at 235.

as well as she was before her fall"), 654 (in February 2009, x-rays show "a clavicle fracture that is healing").  Thus, the ALJ could appropriately conclude that based on the medical evidence, Moss's RFC was limited, and subject to certain restrictions, but not to the extent that she would be unable to work.[28]

_____

[28]The claimant also contends, in a cursory fashion, that the ALJ erred because he did not consider several factors used to evaluate the credibility of an individual's claims regarding her symptoms and their limiting effects.  See SSR 96-7p, 1996 WL 374186, at *3; Avery v. Sec'y of Health & Human Servs., 797 F.2d 19 (1st Cir. 1986); Lalime, 2009 WL 995575 at *9.  Although a detailed written discussion of these factors is preferred, see Frustaglia, 829 F.2d at 195, an ALJ's decision will not be reversed if he explores the factors at the administrative hearing, see Forni v. Barnhart, No. 05-cv-406-PB, 2006 WL 2956293, at *10 (Oct. 10, 2006); Lopes v. Barnhart, 372 F. Supp. 2d 185, 192 (D. Mass. 2005), and there is substantial evidence in the record to support the ALJ's conclusions.  Pires, 553 F. Supp. 2d at 24.

The court finds no error.  Although the ALJ did not specifically address the narrow, disjointed laundry list of favorable evidence Moss contends that it was error not to consider, the credibility discussion in his order revealed a relatively lengthy treatment, with record cites, of his reasons for finding Moss less than credible.  See Frustaglia, 829 F.2d at 195 (ALJ order affirmed where his decision reflected "a complete consideration of the record").  In addition, the hearing transcript (see Admin. R. 23-25 (work history), 26-27, 31, 42 (nature/intensity of pain), 27, 32-33, 36-37 (pain management), 27-28 (daily activities), 26, 27, 35-36 (aggravating factors), 28, 29, 31, 42, 43 (functional restrictions)), reveals that Moss's "attorney and the ALJ asked [Moss] questions implicating several of the relevant Avery factors at the hearing."  Lalime, 2009 WL 995575, at *9; see Frustaglia, 829 F.2d at 195.  The ALJ properly considered Moss's "daily activities, functional restrictions, medication, prior work record, and frequency and duration of the pain."  Frustaglia, 829 F.2d at 195; see Lalime 2009 WL 995575 at *9; cf. Lopes, 372 F. Supp. 2d at 192 (failure to specifically address one factor when the others have been considered is not fatal).

Further, the record supports the ALJ's conclusion that
Moss's subjective complaints were "less than credible based upon
inconsistences noted throughout the record" that cast doubt on
Moss's ability to credibly report the severity and limiting
nature of her symptoms.  Admin. R. 14.  The record is replete
with inconsistencies in Moss's behavior, reports to her care
providers, testimony, and other record evidence.[29]  For example,
at the hearing, she testified that when she hurt her shoulder on
December 31, 2007, she was walking, with her cane, into her home
and fell in the snow.  Admin. R. 34.  Contemporaneous medical
records indicate that she reported to her primary care physician
that "[s]he was out shoveling and slipped and fell and slid
underneath her pickup truck.  Her boyfriend was not doing the
shoveling."  Id. at 702.

 A physical exam in May 2006 showed that while being
examined Moss exhibited a "limited range of motion in all
directions due to pain," and Moss complained that her pain was at
a level of 10 on a 10 point scale, she appeared "in no acute
distress . . . [and was] able to hop off the table to take her
shoes off and then appears very uncomfortable afterwards."  In
the end, the nurse practitioner assessed Moss with "[b]ack pain
of unknown origin."  Id. at 357.

---

[29]The following recitation represents only a partial
recounting of Moss's inconsistent behavior.

33

In April 2006, an emergency room doctor observed:

> [w]hile here at the hospital, the patient was
> noted to have a good deal of behaviors that
> did not seem consistent with her complaints.
> For instance, the patient will complain of
> severe low back pain and headache pain, yet
> she was requesting to walk off the unit to go
> down to Dunkin Donuts to get donuts and
> coffee.  She would talk on the phone with her
> boyfriend and her friends and family and
> would seem fine and then, as soon as she got
> off the phone, would be moaning in pain.
> These are observations both by myself and by
> the nursing staff here . . . [and] we felt
> were somewhat inconsistent with some of her
> complaints.  The patient seems to perseverate
> on her experience over at CMC regarding the
> lumbar puncture she felt that was done
> inappropriately but I do note that they were
> able to get spinal fluid and rule out
> meningitis appropriately.

Admin. R. 338.  Thus, the court concludes that the ALJ could
reasonably discount Moss's subjective complaints of pain based on
record evidence of less than credible behavior.

Despite overwhelming support for the ALJ's opinion that Moss
is not credibly reporting the nature of her limitations, Moss
challenges a few specific findings of the ALJ in an attempt to
undermine the ALJ's conclusions.  The court finds that many of
these challenges are without merit and do not diminish the
soundness of the ALJ's credibility finding or his RFC
determination.

For example, the ALJ found Moss to be less than credible
because "[h]er records also reveal evidence of some drug seeking
behavior."  Admin. R. 15.  Moss contends that the ALJ misread the

record with respect to her alleged drug seeking behavior, thus
casting doubt on his credibility determination.   Cl. Br. 13.
Moss is correct that the ALJ improperly stated that Dr. Hsu did
not prescribe Percocet, and the Commissioner concedes as much.
D's Br. 19.   The ALJ properly cited other evidence in the record,
however, that reasonably supports the conclusion that Moss
exhibited drug seeking behavior.   Admin. R. 15-16.   In
particular, the record reveals evidence, cited by the ALJ, "of
requests for pain medications made to various providers
(emergency room physicians) rather than consistently through her
own primary care provider," id. at 15, and Moss's attempt to
obtain additional Percocet from both the Elliot Hospital and then
Catholic Medical Center on April 29, 2007 and April 30, 2007
while under Dr. Hsu's care.   Id. at 16, see also id. at 448, 455,
548.

        The record reveals additional conduct by Moss and
observations documented by medical providers that reasonably
support the conclusion by the ALJ that Moss exhibited some
"medication seeking behavior," see, e.g., 289, 311, 392-93, 408,
437, 446, 468 ; cf. Tsarelka, 842 F.2d at 535 (court affirms
ALJ's factual findings if they are supported by substantial
evidence in the record even if court does not agree or there is

other evidence to the contrary).[30]   Although Moss contends this
evidence actually bolsters her credibility because it
demonstrates severe symptoms of pain, the ALJ, not the court, is
responsible for drawing inferences from the record, see, e.g.,
Rodriguez, 647 F.2d at 222, and "where the record supports more
than one outcome, the ALJ's view prevails."  Pires, 553 F. Supp.
2d at 21.

    Moss also contends that the ALJ erred when he stated that
the records of Dr. Hsu "repeatedly note findings of no weakness
in her lower extremities."  Admin. R. 15.  Moss argues that
"[t]he ALJ stated that Dr. Hsu found no weakness in her lower
extremities.  Yet, on May 31, 2007, Dr. Hsu noted [Moss] had

---

    [30]For example, on May 15, 2006, Moss had an appointment at
Willowbend Family Practice complaining of pain because she was
unable to obtain an appointment with a pain specialist until May
21st.  Id. at 357.  The attending nurse practitioner observed
that although one month earlier Moss "had a fairly extensive
workup including an MRI . . . which really did not show anything
that would explain the level of pain she was having," Moss
complained that Ibuprofen was "not helping at all with the pain.
. . . [Rather] Percocet was much more helpful."  Id.

    Although the court does not base its decision on this
evidence, this behavior seems to precede her complaint that she
had back pain from the spinal tap.  The court notes record
evidence from an episode in March 2006 where Moss went to the
emergency room at Catholic Medical Center complaining of chest
pain and became upset with the staff for not giving her
additional pain medication even though she was already taking
Vicodin and Xanax for abdominal pain prescribed by a pain
management clinic.  Moss apparently stated that she "has had pain
since age 8," was upset because "I came for pain medication and
you're giving me none," and threatened that unless she received
pain medication "now . . . [or] I go to the Elliot."  Id. at 532.

complaints of right leg weakness and difficulty with mobility and

he found give away weakness with strength testing." Cl. Br. 12

(citations omitted).  This assertion lacks merit, as there is

ample record support for the ALJ's statement.  First, medical

records in the file memorializing eleven appointments with Dr.

Hsu from August 2007 through February 2008 reveal that Dr. Hsu,

with one exception, noted there was "no weakness in both lower

extremities."  Admin. R. 232-242.  The one exception was a visit

on September 6, 2007 where Dr. Hsu noted "[t]here is perceived

weakness of right as compared to the left however there is no

gait deviations with ambulation.  Balance standing and during her

gait is good."  Id. at 235.  Thus, the ALJ's allusion to Dr.

Hsu's repeated findings of no lower-extremity weakness did not

mischaracterize the record.[31]

---

[31]Moss also contends that the ALJ erred when he concluded
that "the record also reveals inconsistencies with regard to the
claimant's use of a cane," id. at 15, because her behavior was
consistent with Moss's notations in her Function Report that she
sometimes, but not always, used a cane.  Moss may have a point
that it might be unfair to cite inconsistent cane use to cast
doubt on her credibility given that in her Function Report she
states that she uses it only when the pain is bad.  However, the
court reads the ALJ's discussion as making, inter alia, two
observations:  (1) that her use of a cane was sporadic, and (2)
that notations by medical personnel regarding lower extremity
weakness and her ability to ambulate without assistance cast
doubt on the disabling nature of her pain, and implicitly, that
use of a cane was pretextual.  While Moss may be right that
sporadic use of the cane is consistent with Moss's Function
Report, the ALJ's conclusion has support in the record.  Cf.
Rodriquez, 647 F.2d at 222 (ALJ is responsible for making
reasonable inferences from the record).

**B.    Physician opinion evidence**

Moss also contends that the ALJ should have given more weight to the functional assessments of treating physicians Dr. Hsu, Dr. Mattin, and Dr. Moran and Nurse Practitioner Driscoll.

---

Moss next contends that the ALJ misrepresented Moss's Function Report because he made her functional abilities at home "sound substantial." She claims it does not accurately reflect her capabilities because the ALJ did not account for her self-reported need to rest after completing most daily activities and the limited manner in which she performs these activities. Cl. Br. 14-15. "To be found disabled, a claimant must show that [she] cannot perform 'substantial gainful activity,' not that [she] is totally incapacitated." Blake v. Apfel, No. 99-126-B, 2000 WL 1466128, at *8 (D.N.H. Jan. 28, 2000) (quotations omitted). "Substantial gainful activity" means an ability to "perform substantial services with reasonable regularity either in competitive or self-employment." Id. (quotations omitted). "[A] claimant's ability to engage in limited daily activities, including light housework, is not necessarily inconsistent with the inability to perform substantial gainful activity." Id. (quotations omitted).

It is true that Moss reports that pain inhibits her ability to complete household tasks in a significant way. Admin R. 163-64. There is, however, record support for the ALJ's conclusion that evidence of Moss's daily activities indicate an ability to perform at slightly less than light capacity. Indeed, other records indicate that at times she presented herself as a single mother who actively cared for her family. See, e.g., id. at 393 (Moss pleads with medical secretary for pain medications because as "a single mom [with] 3 kids" she needs rest), 614 (emergency room report seeming to indicate that she was the primary care giver, including home schooling one child), 694. Such evidence is indicative of an ability "to perform substantial services with reasonable regularity." Blake, 2000 WL 1466128, at *8. The court again is faced with a record that supports two seemingly contradictory views of Moss's abilities. In such cases, it is well-settled that the court is directed to affirm the decision of the ALJ. See, e.g., Rodriguez, 647 F.2d at 222; Pires, 553 F. Supp. 2d at 21 ("where the record supports more than one outcome, the ALJ's view prevails").

38

She also argues that the ALJ improperly gave greater weight to the RFC assessment of the consulting physician, Dr. Meader.  The ALJ credited the treating physicians' conclusions that Moss was limited by her impairments to "a range of light exertion work," but nonetheless found the

> additional limitations assessed by her treating
> providers, i.e. a need to alternate positions from
> sitting to standing or walking approximately every 15
> minutes and anticipated absences about three times a
> month, to be inconsistent with findings noted
> throughout their treatment notes as well as the
> evidence of record as a whole.  Upon assessing the
> claimant's ability to perform work-related activities,
> the above-noted medical providers fail to note specific
> objective findings supportive of their assessed
> limitations.  Rather, their assessments appear to be
> based solely upon allegations of pain made by the
> claimant, who, as noted above, is found to be less than
> fully credible.

Admin. R. 17.

Moss contends that the ALJ erred because there were objective medical findings supporting the assessments of Doctors Hsu, Mattin, Moran, and Nurse Driscoll and therefore the ALJ improperly gave greater weight to Dr. Meader's functional capacity assessment.[32]  The question before the court, therefore,

---

[32]Moss also contends that the ALJ's order was insufficient because it "merely assert[s] that the doctor failed to note objective findings; the decision must contain specific reasons supported by substantial evidence for the weight given to the opinions."  Cl. Br. at 7.  It is true that an ALJ is required to give "good reasons" for discounting a treating physician's opinion.  See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 1996).

is whether the ALJ could properly adopt the opinion of a non-examining physician and specifically discount additional functional limitations assessed by Moss's treating physicians. The analysis is thus two-fold, requiring a determination of whether the ALJ could permissibly (1) adopt only parts of the reports of Moss's treating physicians, and (2) instead rely on a non-examining physician's opinion to formulate Moss's RFC.

There is precedent allowing an ALJ to rely both exclusively on the assessments of non-testifying, non-examining physicians, see Berrios Lopez, 951 F.2d at 431-32, and on the assessment of a non-treating physician in lieu of a treating physician.  See

---

The ALJ's order gave sufficient reasons for his decision. The ALJ discounted the opinions in a limited way only, indicating that despite an earlier finding that the record showed weak objective support for her ailments, they were limiting in terms of weight bearing activities and sustained sitting and standing. The record supports the ALJ's statement that the treating physicians did not support their conclusions with sufficient "specific objective findings."  Admin. R. 229, 266, 772, 766. Although each provider made a cursory reference to the 2008 EMG (which itself presents fairly ambiguous findings), the ALJ could reasonably conclude after review of the entire record that the vague results of Moss's EMG did not support profound limitations. Cf. Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431-32 (1st Cir. 1991)(ALJ could choose to discount treating physicians conclusory statement of disability in light of more thorough findings by non-treating physician).

Further, the ALJ, in his discussion of Moss's RFC, went into great detail about the objectively inconclusive nature of numerous test results.  Moreover, the ALJ's explanation of his reasons for discounting the treating physicians' opinions provided the court with a sufficient window into his analysis to allow for review.  See generally, SSR 96-2p, 1996 WL 374188, at *5.

<u>Tremblay v. Sec'y of Health & Human Servs.</u>, 676 F.2d 11, 12-13
(1st Cir. 1982); <u>Reeves v. Barnhart</u>, 263 F. Supp. 2d 154, 160-162
(D. Mass. 2003).  For the reasons that follow, on the specific
facts of this case, the ALJ could properly rely on the opinion of
Dr. Meader and choose to adopt, in part only, the opinions of
Drs. Hsu, Mattin, and Moran.

**1.    Treating source opinions**

Although the ALJ is the ultimate arbiter of a claimant's
RFC, he is prohibited from disregarding relevant medical source
opinions.  <u>See</u> SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996).
Greater weight is given to a treating source[33] "since these
sources are likely to be the medical professionals most able to
provide a detailed, longitudinal picture of [the claimant's]
medical impairment(s)."  20 C.F.R. § 404.1527(d)(2).  An ALJ need
not give a treating physician's opinion greater weight if it is
not "well-supported by medically acceptable clinical and

---

[33]It is undisputed that Drs. Hsu, Mattin, and Moran were
"treating sources."  <u>See</u> <u>generally</u> 20 C.F.R. § 404.1502.  Nurse
Driscoll, however, is not an "acceptable medical source," <u>see</u>
<u>Anderson v. Astrue</u>, 682 F. Supp. 2d 89, 96 (D. Mass. 2010); <u>see</u>
<u>generally</u>, 20 C.F.R. §§ 404.1513(a)(1)-(5), (d)(1), and therefore
does not generate a "medical opinion" that must be considered by
an ALJ.  <u>See</u> <u>Evans v. Barnhart</u>, No. 02-459-M, 2003 WL 22871698,
at *5-*6 (Dec. 4, 2003); <u>see</u> <u>generally</u> 20 C.F.R. §§ 404.1527(a)
(2), 404.1513(a)(1)-(5), (d)(1).  Rather, opinions generated by a
nurse-practitioner are categorized as "other sources" of
evidence.  <u>See</u> <u>generally</u>, 20 C.F.R. § 404.1513(d).  An ALJ "may"
consider other sources, but is under no obligation to do so.  <u>See</u>
<u>Evans</u>, 2003 WL 22871698, at *6.

laboratory diagnostic techniques and is . . . inconsistent with
other substantial evidence."  SSR No. 96-2p, 1996 WL 374188, at
*1 (quotations omitted); see generally Marshall v. Astrue, No.
08-cv-147-JD, 2008 WL 5396295, at *4 (D.N.H. Dec. 22, 2008);
Lopes, 372 F. Supp. 2d at 193-94; 20 C.F.R. § 404.1527(d)(2).

In this case, the court concludes that the ALJ could
properly limit the amount of weight given to the treating source
opinions because the record supports his finding that severe
limitations are contrary to evidence in the record.  See, e.g.,
Admin. R. at 232-34 (Dr. Hsu observes no lower extremity
weakness), 357 (nurse notes no objective evidence to support
reported pain), 450 (notation that Moss reports pain of "8" on a
scale of "10," but ambulates normally), 505 (Dr. Hsu observes
that Moss could sit for a prolonged period of time), 518 (Moss
rates pain as a "10" but on arrival at the emergency room
ambulates with a steady gait, but on examination ambulates slowly
but without assistance), 666 (Dr. Hsu observes no upper or lower
extremity weakness in August 2007).

It is true that Dr. Mattin's notes from July 2008 indicate
that Moss appeared to be a "[m]iserable woman walking with a cane
but with good attitude about her rehabilitation."  Id. at 709.  A
month earlier, however, when she visited him complaining of chest
pain, Dr. Mattin assessed her with "[c]ostochondritis in addition

to other pains,"[34] and noted she was a "[m]iserable but healthy appearing woman . . . [that] has had a vigorous evaluation at the Elliot Hospital emergency room looking for other causes of her pain and there is no sign of other disease." Id. at 708.

The ALJ was entitled to discount Dr. Moran's conclusions as record evidence supports the view that any limitations were not disabling for a period longer than twelve months.  In February 2008, Dr. Moran noted that with respect to her shoulder she was "back to feeling as well as she was before her fall." Id. at 647.  Records of an x-ray in February 2009 show "a clavicle fracture that is healing." Id. at 654.  Further, it was noted that Moss was making progress and her records do not support a finding of long term disability.  Office notes indicate that by March 31, 2009, Moss had made "great progress, . . . [and although] she is not finished yet, [s]he needs another four weeks of physical therapy." Id. at 659.

Again, Moss's medical records are chaotic and often contradictory.  Thus, the ALJ was required to make numerous judgment calls, which, if supported by substantial evidence, must be affirmed by the court.  Moreover, this is not an instance where an ALJ ignored wholesale Moss's treating physicians.

---

[34]"Costochondral" is defined as "pertaining to a rib and its cartilage." Dorland's Illustrated Medical Dictionary 431 (31st ed. 2007).

Rather, his RFC assessment adopted, in large measure, many of the treating physicians' opinions.[35]

The ALJ permissibly limited his reliance on the treating physician's RFC assessments given that those assessments were, "for the most part, based on [Moss's] own descriptions of pain."[36] Reeves, 263 F. Supp. 2d at 161.  This was reasonable given that the record, when viewed in its entirety, revealed an unclear etiology for her pain and supports the conclusion that Moss was less than credible in reporting the level and disabling nature of her pain.

---

[35]Even Moss's treating physicians did not agree on key restrictions on her RFC.  Compare Admin. R. 226, 769 (Drs. Hsu and Mattin opine that Moss can lift/carry twenty pounds) with Admin. R. 253, 764 (Dr. Moran and Nurse Driscoll opine that Moss can lift/carry less than ten pounds).  Thus, deference is appropriately given to the RFC determination of the ALJ, who is in the best position to make an assessment based on all the evidence.  See SSR 96-5p, 1996 WL 374183, at *4 (medical source statement is one by a provider based on provider's knowledge, while RFC assessment is "the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record").

[36]Moss contends that this case mirrors Redden v. Astrue, No. 08-cv-314-SM, 2009 WL 1650032, at *7 (D.N.H. June 9, 2009), where the court held that an ALJ erred in concluding that a claimant was not disabled where the treating physician's diagnosis of "chronic back pain" relied on subjective reports of pain.  But under Redden, Moss's so-called "diagnoses" of "chronic pain," see Cl. Br. 8, was completed by emergency room doctors who relied not on long term longitudinal views of the claimant's medical history, but her subjective complaints/reporting at the emergency room.  Indeed, given the multiple instances of inconsistent behavior and credibility issues present in the record, and objective support for the ALJ's opinion, the ALJ was well within his right to discount treating physician evaluations based on Moss's subjective complaints.

2.    **Reliance on non-treating physician**

Having determined that the ALJ could reasonably discount the RFC assessments of Drs. Hsu, Mattin, and Moran, the court must now consider whether he was justified in relying more heavily on the opinion of Dr. Meader, a non-treating, non-testifying physician.

An ALJ is required to consider the medical opinions from all acceptable medical sources regarding the nature and severity of a claimant's impairments and resulting limitations.  <u>See</u> 20 C.F.R. §§ 404.1527, 416.927.  Because state agency physicians and consultants are experts in social security disability programs, their opinions on the nature and severity of a claimant's impairments cannot be ignored by an ALJ.  <u>See</u> SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996); 20 C.F.R. §§ 404.1527(f), 416.927(f).  "[T]he First Circuit explained [that] an advisory report of a non-examining, non-testifying physician is entitled to evidentiary weight, which will vary with the circumstances, including the nature of the illness and the information provided

the expert."[37]   <u>Reeves</u>, 263 F. Supp. 2d at 161 (quotations

omitted), <u>see</u> <u>Berrios Lopez</u>, 951 F.2d at 431.

Conflicts between treating physicians and a non-treating

non-examining doctor is for the ALJ to resolve.  <u>Tremblay</u>, 676

F.2d at 12.  The decision to resolve that conflict against the

claimant should be affirmed if "that conclusion has substantial

support in the record . . . ."  <u>Id.</u>; <u>see</u> <u>also</u> <u>DiVirgilio v.</u>

<u>Apfel</u>, 21 F. Supp. 2d 76, 77 (D. Mass. 1998).  Where the treating

physician's disability assessment is conclusory, an ALJ need not

grant that opinion greater weight than a consulting physician.

<u>Tremblay</u>, 676 F.2d at 13.  An ALJ may reasonably rely more

heavily on a non-treating physician's opinion where it is

supported by the objective medical evidence, and, in contrast,

the treating physicians' opinions "are, for the most part, based

on [the claimant's] own descriptions of pain."  <u>Reeves</u>, 263 F.

Supp. 2d at 161.  The ALJ's decision to adopt an assessment by a

non-treating physician is further supported if that assessment

references specific medical findings indicating that the

claimant's file was reviewed with care.  <u>See</u> <u>Berrios Lopez</u>, 951

---

[37]At one time, the court of appeals held that the opinion of
a non-testifying, non-examining physician could not alone provide
substantial evidence supporting an ALJ's RFC assessment.  <u>See</u>
<u>Browne v. Richardson</u>, 468 F.2d 1003, 1006 (1st Cir. 1972).  That
principle "is by no means an absolute rule," <u>Berrios Lopez</u>, 951
F.2d at 431, and indeed, reliance by an ALJ on the opinion of a
non-testifying and non-examining physician instead of a
conclusory assessment by a treating physician has been upheld by
our court of appeals.  <u>Tremblay</u>, 676 F.2d at 13.

F.2d t 431 (ALJ could rely exclusively on non-examining physician
where RFC assessment did not "contain little more than brief
conclusory statements or the mere checking of boxes denoting
levels of residual functional capacity").

The ALJ was justified in placing greater weight on the
opinion of Dr. Meader.  First, Dr. Meader provided a lengthy
analysis discussing his reasons for his RFC assessment,
referencing not only Moss's objective medical testing, but also
her Function Report, and observations from a multitude of
providers she sought out for care.  Admin. R. 261.  This
indicates that Dr. Meader reviewed Moss's file with great care,
Berrios Lopez, 951 F.2d at 431, as is necessary in the case of a
claimant with such a chaotic medical history.

There is objective medical evidence and record support for
his conclusions.  As shown in detail supra, Moss's objective test
results reveal mostly normal physiology, and at most, *possible*
radiculopathy.  Her providers, on many occasions, noted no
interruption in her gait and full lower extremity strength
despite claims of intense pain.  This is not the case where Dr.
Meader completely ignores the disabling effects of Moss's medical
history.  Rather, Dr. Meader reviewed the record and concluded
that Moss had certain limitations, but not full disability.

Finally, as discussed above, the ALJ's well-supported
conclusion that Moss's subjective description of the intensity of

47

her pain was less than credible "is yet another factor making it
reasonable for the [ALJ] to credit the exertional functional
conclusions of non-examining physicians." Berrios Lopez, 951
F.2d at 432.  In sum, the ALJ could properly rely on Dr. Meader's
opinion because "the ALJ did not consider the non-examining
doctor's advisory opinion[] alone but in the context of other
evidence, including the treating doctor's reports, . . . and
[his] credibility assessment of the [claimant's] pain.  Taken
together, this evidence is substantial." DiVirgilio, 21 F. Supp.
2d at 82.


**C.    Other issues**

**1.    Friend's testimony**

     Moss asserts that the ALJ erred in not considering the
testimony of her friend Dean Romilard.  "[T]he First Circuit has
held that an ALJ's written decision need not directly address
every piece of evidence in the administrative record." Lord v.
Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000).  Failure to address a
specific piece of evidence does not undermine the ALJ's decision
"when that conclusion was supported by citations to substantial
medical evidence in the record and the unaddressed evidence was
either cumulative of the evidence discussed by the ALJ or
otherwise failed to support the claimant's position." Id.
Moreover, "while 20 C.F.R. § 404.1513(d) provides that the

48

Commissioner may use evidence from 'other sources' to evaluate the severity of a claimant's impairment, the language of that provision is permissive rather than mandatory." Evans, 2003 WL 22871698 at *6.

Although Romilard's testimony provides limited support of Moss's claimed functional limitations and may somewhat bolster her credibility, Admin. R. 40-43, "such evidence is hardly neutral" and courts will not find fault where substantial other evidence supports the ALJ. Tremblay, 676 F.2d at 13. Further, Romilard's testimony fails to rebut significant evidence supporting the ALJ's RFD assessment, including objective medical evidence, Moss's own inconsistent behavior, and contemporaneous observations by medical providers casting doubt on Moss's credibility.[38]

## 2.   Depression and anxiety

Moss contends that the ALJ erred when he determined, at Step 2, that Moss's depression and anxiety was not severe. A mental impairment is considered "severe" if it significantly limits a

---

[38]This case is unlike Page v. Astrue, No. 08-cv-340-JD, 2009 WL 700148, (D.N.H. Mar. 16, 2009) relied on by Moss for the proposition that it was error for the ALJ not to address Romilard's testimony. In Page, however, the court concluded that it was error for the ALJ to ignore testimony of the claimant's mother where the record lacked substantial evidence to support the ALJ's RFC finding. Id. at *7. Here, there was ample record support for the ALJ's RFC determination.

claimant's ability to undertake the "basic mental demands of
competitive, remunerative, unskilled work [including] the
abilities (on a sustained basis) to understand, carry out, and
remember simple instructions; to respond appropriately to . . .
usual work situations; and to deal with changes in a routine work
setting."  SSR 85-15, 1985 WL 56857, at *4 (1985); see generally
Gonzalez Garcia v. Sec'y of Health & Human Servs., 835 F.2d 1, 2
(1st Cir. 1987).

There is ample support in the record, in the form of both
reviewing and examining consulting psychologist reports that
Moss's anxiety, depression, or other mental impairments were not
severely disabling.  See Admin. R. 270-82, 595-97, 601-602.  To
the extent that Moss argues that the ALJ did not take these
limitations into account when formulating her RFC, see generally,
Forni, 2006 WL 2956293 at *8; 20 C.F.R. § 404.1520, this argument
is without merit.  Although the ALJ did not repeat, in his RFC
analysis, the detailed assessment made at Step 2, it is clear
that he considered her mental impairments when he concluded "[i]n
sum, the above residual functional capacity is supported by
opinion evidence offered by . . . psychological consultants . . .
consistent with the objective medical evidence of record as a
whole."  Id. at 17.  Accordingly, the court finds no error.[39]

_____

[39]Finally, Moss briefly argues that the ALJ erred when he
posed three hypotheticals to the vocational expert.  Moss argues
that the vocational expert's "testimony cannot be considered

IV.  **CONCLUSION**

Pursuant to sentence four of 42 U.S.C. § 405(g), Moss's motion to reverse and remand the Commissioner's decision[40] is denied.  The Commissioner's motion to affirm the decision[41] is granted.  The Clerk of Court is directed to enter an amended judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  April 21, 2011

cc:  Elizabeth R. Jones, Esq.
     T. David Plourde, Esq.

_____

substantial evidence as the hypotheticals did not accurately reflect [Moss's] residual functional capacity.  This is because the RFC was not based on consideration of the entire medical record and is therefore not supported by substantial evidence." Cl. Br. 19.  Having concluded that the ALJ's RFC determination was proper and supported by substantial evidence in the record, the court finds no error.

[40]Document no. 8.

[41]Document no. 10.

51